UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE OPENWAVE SYSTEMS                   :      07 Civ. 1309 (DLC)
SECURITIES LITIGATION,                   :
                                        :         <u>OPINION & ORDER</u>
This document relates to all actions.   :
                                        :
----------------------------------------X

Appearances:

For Lead Plaintiff:
Chad Johnson
Laura Gundersheim
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, New York 10019

For Defendant Openwave Systems Inc.:
Marshall R. King
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

Paul J. Collins
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, California 94304

For Defendants Harold L. Covert, Jr., Kenneth D. Denman, Roger
L. Evans, Bo C. Hedfors, Gerald Held, Masood Jabbar, Bernard
Puckett, Alain Rossmann, and Andrew Verhalen:
Garrett J. Waltzer
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301

For Defendants Alan J. Black, Kevin J. Kennedy, Donald J.
Listwin, Joshua A. Pace, David Peterschmidt, Allen E. Snyder,
and Simon Wilkinson:
Richard A. Spehr
Henninger S. Bullock
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019

For Defendants Merrill Lynch, Pierce, Fenner & Smith Inc.,
Lehman Brothers Inc., J.P. Morgan Securities Inc., and Thomas
Weisel Partners LLC:
A. Robert Pietrzak
Andrew W. Stern
Nicholas P. Crowell
Catherine B. Winter
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019

For Defendant KPMG:
Mary Gail Gearns
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022

Dale E. Barnes, Jr.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, California 94111

DENISE COTE, District Judge:

Plaintiff brings this action on behalf of a putative class
of all persons or entities who purchased or acquired common
stock in Openwave Systems, Inc. ("Openwave"), the self-
proclaimed "leading provider of open software products and
services for the communications industry," during a class period
that spanned from September 30, 2002 through October 26, 2006.
Plaintiff alleges that Openwave's stock price dropped
dramatically as a result of the defendants' seven-year-long
stock options backdating scheme, which forced Openwave to
restate its previously-filed financial statements for fiscal
year 2000 through the third quarter of 2006 by more than $182
million.

Plaintiff brings claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Openwave, certain of its officers and directors, the underwriters of its December 2005 stock offering, and its auditor. Defendants have moved to dismiss all claims. Defendants' motion to dismiss the Securities Act claims is granted; the motion to dismiss the Exchange Act claims is granted in part.

BACKGROUND

The following facts are taken from the First Corrected Consolidated Amended Class Action Complaint (the "Complaint") filed on August 3, 2007 and the documents to which it refers, unless otherwise noted.

I. The Parties

A. The Lead Plaintiff

On May 29, 2007, the Arkansas Teacher Retirement System, a public pension benefit fund that holds assets of approximately $10 billion for the benefit of current and retired Arkansas public school teachers, was appointed lead plaintiff in this action. Plaintiff claims to have purchased shares of Openwave common stock during the class period, and to have suffered

financial loss as a result of the federal securities laws violations alleged in this suit.[1]

      B.   The Defendants

         1.   The Company

Openwave, a corporation organized under the laws of the State of Delaware with its principal place of business in California, develops software products and services for the telecommunications industry. Throughout the class period, Openwave was listed and publicly traded on the NASDAQ exchange under the symbol "OPWV."

         2.   The Individual Defendants

Under the Securities Act, plaintiff has brought claims against two Openwave officers: David C. Peterschmidt, who served as President, CEO, and a director from November 2004 through March 2007, and Harold L. Covert, Jr., who is currently CFO and Executive Vice President of Openwave, and served as a director and chairman of the audit committee of the company from April 2003 to September 2005. Plaintiff has also brought Securities Act claims against five directors of the company: M. Bernard Puckett, Kenneth D. Denman, Bo C. Hedfors, Gerald Held, and

---

[1]    The Fresno County Retirement Association ("FCERA"), a public pension fund that claims to have purchased shares of Openwave common stock during the class period, joins in this action as a named plaintiff.

Masood Jabbar. Collectively, these defendants will be referred to as the "Individual Securities Act Defendants."

Under the Exchange Act, plaintiff has brought claims against Peterschmidt and Covert, as well as eight additional officers. They are: Donald J. Listwin, President, CEO, and a director of Openwave from September 2000 to April 2003; Alan J. Black, formerly Senior Vice President of Finance and Administration, CFO, and Treasurer; Joshua A. Pace, formerly Vice President of Finance and Chief Accounting Officer; Allen E. Snyder, Chief Operations Officer until November 30, 2006; Steve Peters, formerly Senior Vice President, Legal Officer, Vice President, and General Counsel of Openwave, and currently its Executive Vice President and Chief Administrative Officer; Alain Rossmann, Chairman and CEO until June 2001; Simon Wilkinson, Vice President of Sales and Client Business from July 2004 through January 2005, and currently Senior Vice President and General Manager; and David J. Kennedy, Chief Operating Officer from August 2001 through September 2003, an advisor from October 2003 to June 2005, and a director from October 2002 to June 2005. In addition to the directors listed above, plaintiff has brought Exchange Act claims against former directors Roger L.

Evans and Andrew W. Verhalen.  Collectively, these defendants

will be referred to as the "Individual Exchange Act Defendants."[2]

### 3.    The Underwriter Defendants

Defendants Merrill, Lynch, Pierce, Fenner & Smith

Incorporated, Lehman Brothers Inc., J.P. Morgan Securities Inc.,

and Thomas Weisel Partners LLC (the "Underwriter Defendants")

provided underwriting services for Openwave's December 2005

common stock offering.  Plaintiff alleges that, as "part of

their duties as underwriters," these defendants were paid for

their underwriting services and provided equity research

coverage of Openwave.

### 4.    The Auditor Defendant

Finally, plaintiff brings a claim under the Securities Act

against defendant KPMG LLP ("KPMG" or the "Auditor Defendant")

which served as Openwave's auditor.  Plaintiff alleges that, for

each of the fiscal years covered by the class period, KPMG

issued "an unqualified audit opinion on the Company's

consolidated financial statements."

## II.  The Backdating Scheme

Between 2000 and 2006, Openwave granted stock options to

its officers, directors and employees pursuant to at least three

different stock option plans, the stated purpose of which was to

---

[2]    The Complaint and plaintiff's brief make reference to a
"Defendant Solomon," but no such defendant is identified in the
Complaint or named in any cause of action.

"attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Consultants of the Company and its Subsidiaries and to promote the success of the Company's business." Under two of Openwave's stock option plans, the board of directors or a designated committee was responsible for determining the exercise price of each option grant; under the third plan, the board alone was responsible for setting the exercise price. Each of these plans was subject to limitations; the most important of these limitations for the purposes of the instant litigation was that the stock options must not have an exercise price less than the fair market value of a share of Openwave common stock on the date of the grant. Openwave repeatedly represented to its shareholders and the public that it was issuing stock options in compliance with the terms of the stock option plans.

Each stock option gave the recipient the right to buy one share of Openwave stock from the company at a set price, called the "exercise price" or "strike price," on a future date after the option vested. By granting a stock option with an exercise price lower than the market price on the date of the grant, a company effectively grants an employee an instant opportunity for profit. This backdating, plaintiff alleges, removed the officers' incentive to promote Openwave's success and, contrary

to the company's SEC filings concerning options grants, did nothing to "align the financial interests of the executive officers with the performance of the Company business objectives, and reward executives for their ongoing contributions to the organization."

Backdating also has accounting consequences for the grantor company. Openwave repeatedly represented in its financial statements that the company had elected to follow various generally accepted accounting principles. Those principles include Accounting Principles Board Opinion No. 25 ("APB No. 25"), which governed accounting for stock-based compensation through June 2005. APB No. 25 required companies to record the "intrinsic value" -- generally the market value -- of an option at the time it is granted. If an option had been issued at market price on the date of its issuance, the grantee need not have reported the grant as income, and the grantor company need not have reported it as employee compensation. But if an option had been backdated, APB 25 required the company to record as compensation the amount by which the market price exceeded the exercise price for the duration of the grant's vesting period, which was generally ten years in Openwave's case. Plaintiff alleges that Openwave failed to do so, thereby materially

underreporting the company's compensation expenses and inflating its earnings per share in each year of the vesting period.[3]

III. The Secondary Offering

During the class period, Openwave conducted a secondary offering of its stock.  In December 2005, the company filed a set of offering documents with the SEC.  Those documents included financial data for fiscal years 2002 through 2005, and incorporated by reference Openwave's Form 10-K for the year ending June 30, 2005 as well as a letter from defendant KPMG addressed to the Openwave board of directors consenting to Openwave's use of KPMG's September 12, 2005 audit report in the offering documents and to Openwave's referring to KPMG as "Experts" in the offering documents.  The Underwriter Defendants served as the managers of this offering.

---

[3]    Additionally, plaintiff alleges that the decline in the company's use of backdated options after the passage of the Sarbanes-Oxley Act, which became effective on August 29, 2002, is powerful evidence that the backdating practice was intentional and intentionally deceptive.  Before Sarbanes-Oxley, option grantees reported the grants to the SEC on financial forms that were due forty-five days after the company's fiscal year end.  Following enactment of Sarbanes-Oxley, a company's ability to backdate option grants was greatly diminished because grantees were required to report the grant to the SEC within two days of receiving it.  Plaintiff observes that there was a precipitous decline in Openwave's alleged backdating activity after the Sarbanes-Oxley effective date, and alleges that, "[h]ad Defendants not been intentionally backdating options, but instead, simply committing 'administrative and recordkeeping errors,' they would likely have continued to backdate options at the same or similar rate throughout fiscal years 2003 through 2006."

IV.   The Scheme Becomes Public

On March 18, 2006, <u>The Wall Street Journal</u> published an article concerning the manipulation of stock options by public companies.  The article discussed the possibility that the companies had backdated the stock options to dates with lower strike prices, or "spring loading" the options by granting them on strike dates ahead of the release of positive corporate news. The publication of this article spurred investigations by the Securities and Exchange Commission ("SEC"), executive resignations, and financial restatements by public companies implicated in stock-manipulation schemes.  On May 22, 2006, Openwave issued a press release announcing that the SEC had initiated an informal inquiry into the company's historical practice of granting stock options.  The press release advised that "the SEC letter states that the formal inquiry should not be construed as an indication by the SEC or its staff that any violation of law has occurred, or as an adverse reflection upon any person, entity, or security."

On July 5, 2006, Openwave notified the SEC through a public filing that it had received subpoenas from the United States Attorneys for the Northern District of California and for the Southern District of New York requesting documents concerning the company's granting of stock options.  On October 4, Openwave announced that it had convened a special committee of the

company's board of directors to investigate any possible stock options backdating, and that the special committee had discovered irregularities in the issuance of certain stock option grants made between fiscal years 2000 and 2005. Openwave suggested that it would likely be forced to restate its financial results for those fiscal years and that, accordingly, "financial statements previously issued by the Company should no longer be relied upon." On October 26, Openwave issued another press release confirming that "the measurement dates for financial accounting purposes for certain stock option grants differ from recorded grant dates for certain awards."

Openwave announced the completion of the special committee's internal investigation on December 1, 2006, and filed its 2006 Form 10-K with the SEC restating the company's financial results since 1999. A press release attached to the Form 10-K notified the public that the special committee had "identified certain circumstances in which the grant date used by the Company as the 'measurement date' for accounting purposes preceded the appropriate measurement date." As a consequence, "Openwave re-measured certain stock option grants which resulted in additional non-cash charges for stock-based compensation and associated payroll tax expense for fiscal years 2000 through 2005, totaling approximately $182 million." This figure represented

(a) additional non-cash stock-based compensation
expense and the associated payroll tax expense
relating to employee stock and option grants prior to
fiscal year 2006, (b) adjustments of income tax assets
and liabilities, and (c) adjustments of accumulated
deficit, deferred revenue, and accrued liabilities.

The Form 10-K reported, however, that the special committee "did

not find evidence that lead [sic] it to conclude there was fraud

in the granting of options."

The price of Openwave stock fluctuated widely during the

class period, reaching a high of $23.19 per share on February 9,

2006, and a low of $6.09 per share on July 20.  Plaintiff

describes the high price as "artificially inflated" due to

Openwave's reporting outstanding financial results in early

2006, and ascribes the low price to the public revelations of

the option backdating scheme.  Indeed, plaintiff asserts that

particular drops in Openwave's stock price are traceable to

particular disclosures about the company's backdating scheme.

For example, plaintiff asserts that the May 22, 2006 press

release announcing an SEC informal inquiry into Openwave's

option granting practice spurred a sixty-nine-cent decrease in

the stock's price that day.

Plaintiff asserts that the entirety of the artificial

inflation to Openwave's stock price from the fraud was "removed"

by July 20, 2006.  Further, plaintiff alleges that while the

stock price was artificially inflated, the Exchange Act

Individual Defendants "engaged in a massive insider trading bailout, selling more than $54.8 million worth of Openwave stock in violation of the securities laws."

     V.   Theories of Liability

     Under the Securities Act, plaintiff alleges that the Securities Act Individual Defendants, the underwriters, and KPMG are among those "statutorily responsible for untrue statements in the Offering Documents pursuant to which Openwave issued common stock to the public in December 2005."  Plaintiff contends that these defendants "failed to fulfill their duty" to the investors to "conduct, prior to the Offering, a reasonable investigation of the Company to ensure that the statements contained in the Offering Documents contained no material misstatements or omissions of material fact."  Plaintiff brings claims against Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG under Sections 11, 12(a)(2), and 15 of the Securities Act.  Plaintiff avers that these claims are "exclusively strict liability and negligence claims" and "expressly disclaim[s] any claim of fraud or intentional misconduct . . . in these non-fraud claims."

     The gravamen of the Complaint against Openwave and the Exchange Act Individual Defendants is that, by effecting the backdating scheme and concealing it from shareholders and the public, they (1) violated generally accepted accounting

                                  13

principles (GAAP); (2) issued options with terms that violated the requirements of the company's stock option plans, rendering fraudulent all company representations to the contrary; (3) misled investors by representing that the grant of stock options to company employees was intended to enhance company performance; and (4) misrepresented the value of officer, director, and employee compensation in various company filings. Accordingly, under the Exchange Act, plaintiff asserts that Openwave and the Exchange Act Individual Defendants violated Sections 10(b), 20(a), and 20A, as well as the rules and regulations promulgated thereunder, including SEC Rule 10b-5.

Plaintiff filed a complaint against Openwave, Alan Black, David C. Peterschmidt, Harold L. Covert, and Donald Listwin on February 21, 2007. A Consolidated and Amended Class Action Complaint against all the defendants named in the instant action was filed on June 29, and the First Corrected Consolidated and Amended Class Action Complaint -- the one at issue here -- was filed on August 3.

Defendants now move to dismiss for a variety of reasons. Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG move to dismiss plaintiff's Securities Act claims as barred by the Act's one-year statute of limitations. Openwave and the Exchange Act Individual

Defendants move to dismiss plaintiff's Exchange Act claims principally for failure to plead scienter and loss causation.

DISCUSSION

I.  Securities Act Claims

Plaintiff brings claims under the Securities Act against Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG.  Section 11 of the Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a).  The purpose of the section was "to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  Section 12(a)(2) of the Securities Act allows a purchaser of a security to bring a private action against a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."  15 U.S.C. § 77l(a)(2).  Section 15

extends Securities Act liability to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under [section 11] or [section 12] of this title." 15 U.S.C. § 77o.

Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG all move to dismiss plaintiff's claims under the Securities Act as time-barred by the Securities Act's one-year statute of limitations. Claims brought under Sections 11 and 12 of the Securities Act are subject to a one-year statute of limitations. See 15 U.S.C. § 77m. The limitations period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992).

A duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action. Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (citation omitted). The circumstances giving rise to the duty to inquire are referred to as "storm warnings." Id. (citation omitted). "Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate." Lentell v. Merrill Lynch &

<u>Co., Inc.</u>, 396 F.3d 161, 169 (2d Cir. 2005). In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice "because the warning signs are accompanied by reliable words of comfort from management." <u>LC Capital Partners LP v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 155 (2d Cir. 2003). While such statements must be considered, their existence will prevent or dissipate the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." <u>Id.</u> "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." <u>Id.</u>

Because plaintiff's duty to investigate was triggered no later than June 8, 2006, its Securities Act claims, which were first pleaded in the Consolidated and Amended Class Action Complaint filed on June 29, 2007, are untimely. For purposes of a motion to dismiss, the Second Circuit has

> deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

<u>Rothman v. Gregor</u>, 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted).

In the Complaint, plaintiff pleaded that it was aware of a March 18, 2006 Wall Street Journal article "questioning whether several public companies had been manipulating stock option grants to enrich executives by backdating those grants to lower prices or granting options to executives ahead of the release of positive corporate news." On May 16, 2006, the Center for Financial Research and Analysis issued a report specifically identifying Openwave as a company "at high risk for having backdated stock options granted its senior executives." The initial complaint filed in this action identified this report as the trigger of a significant drop in Openwave's stock price between May 16 and May 17.[4] On May 22, Openwave issued a press release announcing that the SEC had opened an informal inquiry into the company's stock option grants. On June 8, Openwave filed a Form 8-K with the SEC announcing that three shareholders had filed separate derivative lawsuits in California state and

_____

[4] Because Plaintiff cited this report both in its original complaint and in its Memorandum of Law in support of its motions to be appointed lead counsel and to consolidate all related actions -- but, conspicuously, not in the First Corrected Consolidated and Amended Class Action Complaint -- the document is properly considered on this motion to dismiss as a document "that the plaintiff[] either possessed or knew about and upon which [it] relied in bringing the suit." <u>Rothman</u>, 220 F.3d at 88 (citation omitted).

federal courts on May 26 and May 30.  According to the Form 8-K, these lawsuits accused Openwave officers and directors of breaching their fiduciary duties by authorizing, or failing to halt, the backdating of certain stock options, and also claimed that the Company had issued false and misleading financial statements between 2002 and 2005.

These news reports, public filings, and press releases, all appropriately considered on this motion to dismiss, indicate that plaintiff's duty to inquire into Openwave's alleged backdating was triggered, at the latest, by June 8, 2006, and that the one-year statute of limitations on its Securities Act claims ended on June 8, 2007.  Since the evidence is overwhelming that plaintiff was on inquiry notice of Openwave's alleged backdating, the statute of limitations question may be resolved on a motion to dismiss.  See LC Capital, 318 F.3d at 155-56.  While the Wall Street Journal's March 18, 2006 general discussion of backdating was insufficient to trigger any duty to investigate, the subsequent disclosures discussed above were sufficiently "company-specific" to "trigger a duty to investigate."  Lentell, 396 F.3d at 169.  That is, the disclosures "relate[] directly to the misrepresentations and omissions the Plaintiffs later allege in their actions against the defendants."  Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (citation omitted).

Plaintiff contends that it was under no duty to inquire prior to the October 4, 2006 announcement that a special committee of the board had discovered irregularities in the issuance of stock option grants between 2002 and 2005, which would likely result in a restatement of the company's finances. Plaintiff argues that inquiry notice was not triggered by earlier disclosures because those disclosures "made no mention of the potential need for a restatement nor did [they] indicate that the Company's past financial statements might be affected in some material way." This argument is unavailing. Disclosures made well before October 2006 concerned the defendants' alleged misrepresentations and omissions, as well as the allegedly false and misleading nature of the company's financial statements. Indeed, because plaintiff's Securities Act claims are not fraud-related, but rather concern strict liability and negligence for misrepresentations or misstatements by the defendants, the disclosures gave plaintiff more than adequate prompting to inquire into Openwave's alleged wrongdoing. Likewise, the three lawsuits adverted to in Openwave's Form 8-K concerned the same security, backdating scheme, and alleged malfeasance by Openwave directors and officers that form the core of plaintiff's claims pleaded in the

instant Complaint.[5]  These similarities confirm that investors

were on inquiry notice of the alleged backdating scheme.[6]

Similarly unpersuasive is plaintiff's argument that

defendants provided "words of comfort" to the public, dispelling

the need to investigate any wrongdoing.  Plaintiff contends that

Openwave management's conduct during the relevant time period

"was deceptively designed to assure the market that Openwave's

financial condition would not be impacted by the backdating

investigation."  Specifically, plaintiff deems "particularly

reassuring" Openwave's September 13, 2006 announcement that the

---

[5]     In this respect, plaintiff's reliance on In re Ames Dep't
Stores, Inc. Note Litig., 991 F.2d 968 (2d Cir. 1993), is
misplaced, because that decision turned on the fact that the
stockholders and subordinated noteholders held different
interests in the Ames Department Stores, and therefore were
concerned with different types of information.  The information
that put the Ames shareholders on notice of previously-filed
false financial statements did not put its noteholders on notice
that the company would not "meet its obligations on the debt
instruments when due."  Id. at 980.  Regardless of whether, as
plaintiff claims, the earlier-filed lawsuits alleged Openwave
officers' breach of fiduciary duty to the company, they put
plaintiff on inquiry notice of the alleged backdating scheme.

[6]     In opposing the motion to dismiss, plaintiff relies on a
number of documents that are inappropriate for consideration on
a motion to dismiss because they were not referred to or
incorporated by reference in the Complaint, nor are they legally
mandated disclosure documents or documents "upon which
[plaintiff] relied in bringing the suit."  Rothman, 220 F.3d at
88 (citation omitted).  Accordingly, defendants' responsive
filings in the earlier Openwave derivative lawsuits and the
analysts' reports concerning assurances made by Openwave between
May 22 and July 6, 2006, will not be considered on this motion
to dismiss.  In any event, consideration of these documents
would not change the outcome of this motion.

stock option investigation "is still ongoing and no determination has been made as to whether it will result in any impact on the Company's financial statements." An "investor of ordinary intelligence" would not "reasonably rely" on such a statement to allay his or her concerns about potential wrongdoing at Openwave. LC Capital, 318 F.3d at 155. Far from providing reassurance, the statement underscores that Openwave's investigation of the backdating scheme, based on allegations that had been public for over three months, was still proceeding. Management's aspirational statements concerning potential financial restatements cannot have served to dissipate plaintiff's duty to inquire.

Finally, plaintiff claims that, regardless of when it was placed on inquiry notice, the statute of limitations on its Securities Act claims did not begin to run until, "in the exercise of reasonable diligence, [plaintiff] should have discovered the facts underlying the alleged fraud." Rothman, 220 F.3d at 97. Plaintiff concedes that, while its investigation into Openwave yielded some information about the company's backdating prior to October 4, 2006,

> no information was available from either the Company's own SEC filings and press releases or Company witnesses to indicate that it was probable that the Company had been improperly accounting for its compensation expenses thereby rendering the Company's past financial statements materially false and misleading.

Regardless of how plaintiff now parses the different species of information it did or did not acquire through its investigation, it is plain that plaintiff was alerted to Openwave's alleged backdating scheme, which constitutes the "facts underlying" the core of the Securities Act claims. Plaintiff need not have been aware of the precise accounting consequences of that scheme to have been put on inquiry notice, because the scheme that was alleged, and of which plaintiff was aware, was adequate to place plaintiff on inquiry notice as to its potential consequences.

In order to state a controlling-person claim under Section 15 of the Securities Act, a plaintiff must first assert a primary violation by the controlled person. <u>See</u> <u>SEC v. First Jersey Secs., Inc.</u>, 101 F.3d 1450, 1472-73 (2d Cir. 1996). For the reasons just discussed, plaintiff has failed to state any claims upon which relief may be granted under Sections 11 and 12 of the Securities Act. Any claim for relief under Section 15 is therefore precluded. Accordingly, defendants' motions to dismiss the Securities Act claims are granted.[7]

II.  Exchange Act Claims

Plaintiff brings claims under Exchange Act Sections 10(b), 20(a), and 20A, as well as SEC Rule 10b-5, naming different permutations of the Exchange Act Individual Defendants with

---

[7]  Plaintiff has specifically disavowed any argument that the Complaint relates back to the first-filed complaint.

respect to each section.  Plaintiff brings a Section 10(b) claim against Openwave, Peterschmidt, Covert, Listwin, Black, Pace, Rossmann, Kennedy, Puckett, Denman, Hedfors, Held, Jabbar, Evans, and Verhalen; a Section 20(a) claim against Peterschmidt, Covert, Listwin, Black, and Pace; and a Section 20A claim against Peterschmidt, Listwin, Pace, Snyder, Peters, Rossmann, Wilkinson, Kennedy, and Puckett.

Openwave and the Exchange Act Individual Defendants move to dismiss plaintiff's Exchange Act claims principally on the ground that plaintiff failed adequately to plead scienter and loss causation.  In addition, Individual Defendants Rossmann and Verhalen move to dismiss plaintiff's Section 10(b) claims against them because, they contend, plaintiff has not alleged any wrongful conduct on these defendants' part during the putative class period.  Finally, defendants move to dismiss the claims under Sections 20(a) and 20A for failure to state a claim upon which relief can be granted.

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted).  Under Federal Rule of Civil Procedure 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall

be stated with particularity." Fed. R. Civ. P. 9(b). The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). "Malice, intent, knowledge, and other condition of mind of a person may be averred generally," Fed. R. Civ. P. 9(b), but the Private Securities Litigation Reform Act ("PSLRA") requires that the allegations in a complaint support a strong inference of scienter:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4 (b)(2) (emphasis added).

As the Supreme Court recently clarified, "'in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.'" ATSI Commc'n, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510 (2007)). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it]

cogent and <u>at least as compelling</u> as any opposing inference one
could draw from the facts alleged.'" <u>Id.</u> (quoting <u>Tellabs</u>, 127
S.Ct. at 2510).

    A.   Section 10(b) and Rule 10b-5

      1.   Scienter

Section 10(b) of the Exchange Act is designed to protect
investors by serving as a "catchall provision" which creates a
cause of action for manipulative practices by defendants acting
in bad faith. <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 206
(1976). Rule 10b-5, the parallel regulation, describes what
constitutes a manipulative or deceptive device. 17 C.F.R. §
240.10b-5. To state a cause of action under Section 10(b) and
Rule 10b-5 a plaintiff must allege that "the defendant, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that plaintiff's reliance on defendant's action
caused injury to the plaintiff." <u>Lawrence v. Cohn</u>, 325 F.3d
141, 147 (2d Cir. 2003) (citation omitted). Section 10(b)
claims sound in fraud, and must satisfy the pleading
requirements of Rule 9(b) and the PSLRA. <u>See</u> <u>In re Scholastic
Corp.</u>, 252 F.3d 63, 69-70 (2d Cir. 2001).

The Second Circuit has identified four types of allegations
that may be sufficient to allege scienter. They are allegations
that the defendants "(1) benefitted in a concrete and personal

way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) (citation omitted).

Plaintiff pleads scienter based on two theories. First, plaintiff seeks to demonstrate a strong inference of scienter by arguing that options backdating is "by its very nature intentional." In support of this theory, plaintiff offers a variety of species of evidence to demonstrate such intent, including confidential witness statements, statistical analysis of Openwave's stock option grants, the size and duration of the backdating scheme, violations of Generally Accepted Accounting Principals (GAAP), defendants' receipt of backdated options, the resignation of several Openwave executives, and defendants' false certifications under the Sarbanes-Oxley Act. Second, plaintiff seeks to demonstrate scienter by pleading that defendants had motive and opportunity to commit the alleged fraud.

Plaintiff has adequately pleaded scienter with respect to defendants Black, Listwin, Pace, and Kennedy by alleging with specificity that they received backdated options. As the Second Circuit has opined, allegations that a defendant "benefitted in

a concrete and personal way from the purported fraud," id., may be sufficient to plead scienter. These defendants received options, the exercise or strike prices of which did not match the actual date on which defendants received them. The options, most of which were allegedly backdated two days, garnered the defendants immediate returns of up to twenty percent of the exercise price. Such benefits are "concrete and personal" because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors: In distinction to standard stock options, the returns on the backdated options are immediate and risk-free. That the options may have been backdated to dates "nowhere near the monthly lows for Openwave stock," as defendants contend, is irrelevant. This fact simply indicates that backdating did not achieve as much benefit to the grantee as it could have, not that backdating did not occur. In any event, this argument does not arise from the face of the Complaint, and depends on the weighing of evidence of intent which, even after Tellabs, is reserved for trial.

Contrary to defendants' assertion, such evidence is no less probative of scienter after the Supreme Court's decision in Tellabs. In that case, the Supreme Court observed that allegations of defendants' motive in securities fraud cases may not be considered in isolation; rather, "the significance that

can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." _Tellabs_, 127 S.Ct. at 2511. In particular, a court must consider "plausible nonculpable explanations for the defendant's conduct." _Id._ at 2510. Defendants have not pointed to any "competing inferences rationally drawn from the facts alleged," _id._ at 2504, that could explain their receipt of options bearing dates other than the ones on which they received them.

Moreover, it is irrelevant that the options were received before the class period. The accounting for the backdated options affected every financial statement until those options vested. Moreover, each of these defendants continued to work for Openwave through the class period, and the inference of scienter extends from their pre-class-period receipt of the options into the class period during which the fraud is alleged to have continued. Plaintiff has pleaded that during the class period, each of these defendants signed statements that materially misrepresented certain aspects of Openwave's practices and/or financial condition as a result of the backdating scheme. Plaintiff has thus adequately pleaded that these defendants participated in the fraudulent scheme alleged, in violation of Section 10(b) of the Securities Act and SEC Rule 10b-5.

Plaintiff has also adequately plead scienter as to defendants Puckett, Denman, and Hedfors, who were part of the compensation committee of Openwave's board of directors during some portion of the class period. According to the Complaint, the compensation committee granted the stock options through unanimous written consent. The Openwave plans under which the stock options were granted required that the options not have an exercise price less than the fair market value of a share of Openwave common stock on the date of the grant. Accordingly, the members of the compensation committee were charged with a specific "duty to monitor" the exercise dates of the options granted. <u>Novak</u>, 216 F.3d at 311. Their failure to do so, as demonstrated by the facts alleged in the Complaint, gives rise to an inference of scienter. The Complaint also alleges that these defendants signed documents misrepresenting Openwave's finances during the class period. These misstatements, coupled with adequately pleaded scienter, suffice to state a claim under Exchange Act Section 10(b) and Rule 10b-5.[8]

---

[8]    Defendants have offered no argument, other than the ones generically asserted on behalf of all defendants, as to why plaintiff has failed to state a cause of action against Openwave. Because defendant has offered no particularized argument concerning Openwave's Section 10(b) liability, <u>vel non</u>, and because claims against certain of its officers and directors have been adequately pleaded, the claims against Openwave can proceed.

Plaintiff has not, however, adequately pleaded scienter with respect to Peterschmidt. According to the Complaint, Peterschmidt was Openwave's president, CEO, and a director from November 2004 through March 2007. The backdating scheme is alleged to have taken place between 1999 and 2005, with the majority of the backdating alleged to have occurred between 2000 and 2002. The only specific allegations of scienter ostensibly made against Peterschmidt concern the office of the CEO, and not Peterschmidt himself. For example, the Complaint recites an allegation made by Confidential Witness #4 that "the Compensation Committee granted authority to the Company's CEO (Defendants Listwin and Peterschmidt) to independently make awards of 50,000 options or less." Likewise, the Complaint quotes Openwave's 2006 Form 10-K, which concluded:

> there were deficiencies in the process by which certain options were granted by the Stock Option Committee ("SOC"), a one-person committee with authority delegated from the Compensation Committee, consisting of the Company's CEO. For certain grants, the SOC or an executive on his behalf, communicated to the Stock Administration group that the SOC had decided to grant stock options more than one day after the Record Date.

The Complaint avers that, "[b]ased on the Company's reporting of officers, it is clear that this individual was either Defendant Listwin and/or Defendant Peterschmidt." Thus, the two allegations of scienter that ostensibly implicate Peterschmidt personally apply with equal force to Listwin. A fifty/fifty

31

chance that these averments concern Peterschmidt, and not

Listwin, is not enough to infer Peterschmidt's scienter.

Plaintiff also pleaded scienter with respect to

Peterschmidt by alleging (1) the scope and duration of the

backdating scheme; (2) Peterschmidt's resignation three months

after the completion of the special committee's investigation

and the issuance of the restatement; and (3) Peterschmidt's sale

of stock "at inflated prices due to the backdating scheme."

These three allegations, considered individually or taken

together, fail to raise an inference of scienter.  First, while

the backdating scheme was alleged to have infiltrated deep into

Openwave's management and to have lasted from 1999 until the

restatement in 2006, the majority of the backdating scheme is

alleged to have taken place well before Peterschmidt joined the

company in late 2004.  These general allegations about the scope

of the backdating scheme are therefore not sufficiently

particular to Peterschmidt to infer scienter.  Second, the

Complaint does not include a single fact linking Peterschmidt's

resignation to the alleged fraud or his knowledge thereof.

Putting the word "resigned" in quotation marks does not serve as

a substitute for particularized allegations concerning the

circumstances of Peterschmidt's departure.  Third, conclusory

allegations concerning Peterschmidt's sale of Openwave stock do

not serve to infer scienter.  According to the Complaint,

Peterschmidt sold 106,250 of his Openwave shares between
November 2005 and May 2006.  This appears to represent a small
percentage of the shares he owned, and the shares were sold well
below the class-period high price of $23.19 per share on
February 9, 2006.  Plaintiff has not offered any basis from
which to infer that Peterschmidt's stock sales were related to
any knowledge of wrongdoing at Openwave.  Indeed, as plaintiff
alleges, it was after Openwave's likely involvement in
backdating became public that Peterschmidt sold 50,000 shares of
the company's stock.  Finally, plaintiff has failed to plead any
motive or opportunity to commit the alleged fraud that is
particular to Peterschmidt, and not simply incident to his role
as president, CEO, or director.

Plaintiff has also failed adequately to plead scienter
against defendants Covert, Jabbar, Evans, and Held.  Plaintiff
merely alleges that Covert has served as Openwave's CFO and
executive vice-president since October 2005, and before that as
a director and chairman of the audit committee from April 2003
to September 2005, and that he signed various financial
statements.  These allegations are insufficient to infer
scienter.  In particular, because the role and responsibilities
of the audit committee -- other than signing financial
statements -- are nowhere described in the Complaint, it is
impossible to discern whether Covert had any duty to monitor the

dating of option grants, or whether he had access to meetings or documents that might have alerted him to the alleged backdating. See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 23174761, at **4-5 (S.D.N.Y. Dec. 3, 2003).  The only allegations made against defendant Jabbar are that he was a member of Openwave's audit committee; he signed the 2004 Form 10-K disclosure; and he signed the 2005 Form 10-K.  For the reasons just stated concerning Covert, plaintiff has not adequately pleaded scienter as to Jabbar.  The only allegations made against defendant Evans are that he was a member of Opewnave's audit committee, and that he signed Openwave's Forms 10-K for fiscal years 1999 through 2002.  This is insufficient to plead scienter as to him.  Similarly, regarding defendant Held, plaintiff has alleged only that he was a director of Openwave and that he signed the 2005 Form 10-K.  These allegations are insufficient to allege scienter.

2.    Loss Causation

In order to state a Section 10(b) claim, plaintiff must also allege loss causation.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted).  Loss causation is "a causal connection between the material misrepresentation and the loss."  Dura Pharms., Inc., 544 U.S. at 342 (citation omitted).  To plead loss causation, "a plaintiff must allege that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Lentell</u>, 396 F .3d at 173 (citation omitted). "[I]f the loss was caused by an intervening event, like a general fall in the price of [] stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.</u>, 343 F.3d 189, 197 (2d Cir. 2003).

Plaintiff has adequately pleaded loss causation for its Section 10(b) claim. The Complaint alleges a series of Openwave announcements publicizing investigations into the backdating scheme and, eventually, the resultant restatement of the company's finances, and avers that these disclosures led to temporally proximate drops in the price of Openwave stock. For example, the Complaint alleges that the drop in price from $15.37 on Friday, May 19, 2006 to $14.68 on May 22 was a result of the May 22 announcement that the SEC was investigating Openwave's stock option grant practices, and that the drop in price from $11.47 on July 5, 2006 to $7.77 on July 6 resulted from Openwave's Form 8-K filing on July 5, which divulged that the company had received subpoenas from two United States Attorneys concerning its options grants.

Defendants contend that these allegations are insufficient to plead loss causation for a variety of reasons, each of which is unavailing.  First, defendants claim that the May 22 and July 5 curative disclosures are insufficiently tethered to the alleged price declines to raise plaintiff's right to relief "above a speculative level."  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).  With respect to the May 22 trading data, defendants contend both that there was no material stock price movement because there was only a seventeen-cent drop from the stock's closing price on May 19 to its intra-day high on May 22, and that any price movement between May 19 and May 22 was "consistent with routine price fluctuations" in the month of May.  Plaintiff and defendants essentially cavil about whether to measure the price drop between May 19 and May 22 by reference to the May 22 intra-day high price or the closing price.  This is not an issue to be resolved on the basis of the pleadings alone.  For the purposes of a motion to dismiss, plaintiff has adequately alleged that there was a marked decline in Openwave stock price on the date of a curative disclosure about the company's alleged backdating scheme.  Likewise, whether the decline was attributable to some other cause, as defendants allege, is a matter for proof at trial.  See Emergent Capital, 343 F.3d at 197.

With regard to the July 5 announcement, defendants contend that the contents of that disclosure had already been revealed because Openwave had announced the SEC's informal inquiry into the company's stock options granting process on May 22. They therefore contend that no downward movement in the stock price is attributable to this announcement. But the determination whether these two events -- an informal SEC inquiry and two United States Attorneys' subpoenas -- are different phenomena that may exert different influences on the market price of a company's stock is one for the jury to make. Similarly, a jury must determine whether a July 6 announcement that Openwave posted disappointing earnings for the prior quarter caused the stock price to drop, as defendants allege. Id.

Second, defendants make much of plaintiff's observation that the price of Openwave's stock reached its nadir on July 20, 2006, and that the substantial price decline culminating on that date "removed the artificial inflation from Openwave's stock price, causing real economic loss to investors who had purchased the securities during the Class Period." Defendants attempt to portray this allegation as a "conce[ssion] that disclosures made after July 20, 2006, are irrelevant to [plaintiff's] claimed loss because, under their own theory, by July 20, all relevant information was disclosed to the market and reflected in the Company's (no longer "inflated") stock price." Plaintiff has

conceded no such thing.  Rather, plaintiff merely observed that disclosures concerning Openwave's involvement in a backdating scheme had burst the bubble on the company's stock price and sent it to a class-period low.  Such an observation does not preclude any averment that the Openwave stock thereafter rebounded and that disclosures subsequent to July 20 also affected the stock price.  In any event, on the basis of its averments about the May 22 and July 5 curative disclosures, and their effects on the market price of Openwave stock, plaintiff has adequately pleaded loss causation for its Section 10(b) claim.

 3.    Failure to State a Claim

 Finally, plaintiff has failed to state a claim against the fourth member of the compensation committee, defendant Alain Rossmann, because it has failed to allege that he made any misrepresentation during the class period.  A defendant is only liable for statements made during the class period.  <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 153 (2d Cir. 2007). Plaintiff has similarly failed to identify any misrepresentation or misstatement attributable to defendant Andrew Verhalen, whose relationship with Openwave ended in June 2002, before the commencement of the class period.  Plaintiff's effort to argue that Rossmann and Verhalen had some nebulous "duty to correct" misstatements they made during their tenure at Openwave is

unavailaing, as plaintiff identifies neither the source of that duty nor the precise avenue for the correction that allegedly ought to have been made.[9]  Moreover, as <u>Lattanzio</u> makes clear, a duty to correct arises "when [the defendant] learned that its prior statement . . . was untrue."  <u>Id.</u> at 154.  Plaintiff claims that Rossmann and Verhalen knew the financial statements to be untrue at the time they signed them.  Because these statements were made before the class period, plaintiff cannot hold Rossmann and Verhalen liable on the theory that they are in "endless breach" of some duty to correct.  <u>Id.</u>  As the Second Circuit has recognized, if it were to adopt such a theory, "all knowing misstatements made before the class period, which remain uncorrected, would be actionable within the class period on an omission theory."  <u>Id.</u> (quoting <u>In re The Warnaco Group, Inc. Sec. Litig.</u>, 388 F. Supp. 2d 307, 315 (S.D.N.Y. 2005)).  Accordingly, Rossmann and Verhalen's motion to dismiss plaintiff's Section 10(b) claims against them is granted.

B.   Section 20(a)

    Plaintiff asserts control person claims under Section 20(a) of the Exchange Act, contending that defendants Peterschmidt, Covert, Listwin, Black, and Pace "directly or indirectly,

---

[9]    Both cases cited by plaintiff, <u>Lattanzio</u> and <u>Overton v. Todman & Co.</u>, 478 F.3d 479 (2d Cir. 2007), deal only with an accountant's duty to correct financial statements later found to be erroneous, false, or misleading.

control[led] any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). On this motion to dismiss, defendants have argued only that plaintiff failed adequately to plead the violations underlying the Section 20(a) claims, and that the Section 20(a) claims are therefore unsustainable. But as discussed above, plaintiff's Section 10(b) claims were adequately pleaded as to several defendants. Because defendants have not identified any other reason why the Section 20(a) claims should be dismissed, those claims will go forward as to all defendants named in this cause of action.

C.   Section 20A

Plaintiff brings a cause of action under Section 20A of the Exchange Act against defendants Peterschmidt, Listwin, Pace, Snyder, Peters, Rossmann, Wilkinson, Kennedy, and Puckett. Defendants have moved to dismiss this cause of action for plaintiff's failure to plead an underlying violation of the Exchange Act and for failure to allege contemporaneous stock trading. Section 20A provides that

> [a]ny person who violates any provision of this
> chapter or the rules or regulations thereunder by
> purchasing or selling a security while in possession
> of material, nonpublic information shall be liable . .
> . to any person who, contemporaneously with the
> purchase or sale of securities that is the subject of
> such violation, has purchased (where such violation is
> based on a sale of securities) or sold (where such

> violation is based on a purchase of securities)
> securities of the same class.

15 U.S.C. § 78t-1(a).  A plaintiff bringing a claim under this section must therefore plead: (1) "a predicate violation of the [Exchange] Act or its rules and regulations," <u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 703 (2d Cir. 1994); (2) that the defendant traded the security at issue "contemporaneously" with the plaintiff; and (3) that the defendant was "in possession of material, nonpublic information" at the time of the trade.

There is some dispute as to whether causes of action under Section 20A are subject to the pleading requirements of Federal Rule of Civil Procedure 8, or the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  <u>Compare</u> <u>In re Qwest Commc'n Int'l, Inc. Sec. Litig.</u>, 396 F. Supp. 2d 1178, 1201 (D. Colo. 2004) (taking the former view), <u>with</u> <u>In re MusicMaker.com Sec. Litig.</u>, No. 00 Civ. 2018, 2001 WL 34062431, at *27 (C.D. Cal. June 4, 2001) (taking the latter view).  This question need not be resolved in the instant case, however, because the outcome is unaffected by the applicable pleading standard.[10]  As to defendants Puckett, Listwin, Pace,

---

[10]  The Second Circuit has not yet confronted this issue, but it would appear that under Second Circuit law the heightened pleading requirements of the PSLRA and Rule 9(b) would apply to claims brought under Section 20A.  By its terms, the PSLRA's pleading requirements apply to allegations of scienter and

and Kennedy, the Section 20A claims have been adequately

pleaded.  The Complaint has identified with particularity the

fraudulent statements attributed to each of them and explained

why they are fraudulent.  <u>Lerner</u>, 459 F.3d at 290.  Moreover, as

---

material misstatements and omissions; likewise, Rule 9(b)
concerns "averments of fraud or mistake."  Claims of insider
trading inherently raise the specter of scienter and fraud,
because they are predicated on allegations that the trading
party was in possession of "material, nonpublic information" at
the time of his/her trade, and that s/he breached a duty either
to abstain or disclose the insider information in consummating
the insider trade.  Indeed, the Second Circuit recognizes two
different theories under which insider trading might be regarded
as fraud or deception.  <u>See</u> <u>United States v. Falcone</u>, 257 F.3d
226, 228-33 (2d Cir. 2001).

    Even if Section 20A were to be read as a strict liability
statute, the allegations underlying plaintiff's cause of action
would require at least that the requirements of Rule 9(b) apply.
In <u>Rombach v. Chang</u>, 355 F.3d 164 (2d Cir. 2004), the Second
Circuit considered the pleading requirement applicable to claims
under Sections 11 and 12(a)(2) of the Securities Act, which by
their terms impose liability for misrepresentations of material
fact in registration statements or securities prospectuses,
respectively.  To state a claim under either section, a
plaintiff need not plead scienter, mistake, or fraud.  But the
Second Circuit determined that the wording of Federal Rule of
Civil Procedure 9(b) "is cast in terms of the conduct alleged,
and is not limited to allegations styled or denominated as fraud
or expressed in terms of the constituent elements of a fraud
cause of action."  <u>Id.</u> at 171.  Therefore, the court held that
"the heightened pleading standard of Rule 9(b) applies to
Section 11 and Section 12(a)(2) claims insofar as the claims are
premised on allegations of fraud."  <u>Id.</u>  Thus under <u>Rombach</u>, in
determining which pleading standard applies to a securities
cause of action, a court must look not to the statutory elements
of the cause of action, but rather to the underlying conduct
alleged.  Here, the Section 20A claim is premised on allegations
of fraud, insofar as these claims hinge on the defendants'
knowledge of non-public information concerning a backdating
scheme that eventuated in false and misleading financial
statements.  Accordingly, plaintiff's pleadings on the Section
20A claim must be evaluated under Rule 9(b).

discussed above, plaintiff has adequately pleaded scienter with

respect to each of these defendants, in satisfaction of the

requirements of both the PSLRA and Rule 9(b).  In addition, the

Complaint alleges that members of the putative class traded

Openwave stock contemporaneously with the defendants named in

the Section 20A cause of action,[11] and has specified the dates of

the defendants' trades.  Such averments are sufficient to state

a cause of action under Section 20A.[12]

     Plaintiff, however, has failed to state a claim as to

defendant Peterschmidt.  As noted above, in order to state a

claim under Section 20A, a plaintiff must allege, inter alia,

that the defendant was "in possession of material, nonpublic

---

[11]   As the Second Circuit has held, the lead plaintiff need not
have standing to sue on all possible causes of action.  See
Hevesi v. Citigroup Inc., 366 F.3d 70, 82 & n.13 (2d Cir. 2004).

[12]   Neubronner v. Milken, 6 F.3d 666 (9th Cir. 1993), upon
which defendants rely, is distinguishable from the case at bar.
In that case, which addressed the adequacy of a Section 10(b)
insider trading claim, the plaintiff "suggest[ed] he should be
permitted to allege generally that contemporaneous trading
occurred, and then amend his complaint following discovery of
any particular instances of contemporaneous trading."  Id. at
670.  The Ninth Circuit rejected this suggestion, "[i]n light of
the obvious need to protect parties from having to defend suits
against plaintiffs who may be merely guessing that
contemporaneous trading occurred."  Id.  In the instant case,
there is no risk of a fishing expedition, as plaintiff has
alleged with specificity the dates of defendants' trades and the
action is brought on behalf of a class under circumstances that
make it likely that members of the class bought the securities
sold by these defendants.  It is alleged that Openwave
securities were traded in an open and efficient market.

information" at the time of the trade.  15 U.S.C. § 78t-1(a).

For the reasons discussed above, plaintiff has failed to allege

that Peterschmidt was privy to any material, nonpublic

information concerning the backdating scheme at Openwave, or was

otherwise aware of the false and misleading nature of the

financial statements he signed.  Accordingly, the Section 20A

claim must be dismissed as to him.[13]

Likewise, plaintiff's Section 20A claim as to defendants

Rossmann, Snyder, Peters, and Wilkinson must be dismissed for

failure adequately to allege an underlying violation of the

Exchange Act.  For reasons discussed above, plaintiff failed

adequately to plead Exchange Act violations as to defendant

Rossmann.  Plaintiff failed entirely to allege any underlying

Exchange Act violations as to defendants Snyder, Peters, and

Wilkinson.  The Section 20A claims against them are therefore

dismissed, as well.

CONCLUSION

Defendants' motion to dismiss is granted with respect to

all Securities Act claims; granted with respect to the Exchange

Act Section 10(b) and SEC Rule 10b-5 claims as to defendants

---

[13]    Section 20A applies to any person who has violated "any
provision of this chapter," which the Second Circuit interpreted
to mean the Exchange Act.  See Jackson Nat'l Life Ins. Co., 32
F.3d at 703.  Because there is no limitation inscribed in this
clause, it appears that the Section 20(a) violation adequately
pleaded as to Peterschmidt would qualify as the required
predicate for this element of a Section 20A claim against him.

Peterschmidt, Covert, Held, Jabbar, Rossmann, Evans, and

Verhalen; and granted with respect to the Exchange Act Section

20A claims as to defendants Peterschmidt, Rossmann, Snyder,

Peters, and Wilkinson. The motion to dismiss is denied with

respect to the Exchange Act Section 10(b) and SEC Rule 10b-5

claims as to defendants Openwave, Puckett, Denman, Hedfors,

Listwin, Black, Pace, and Kennedy; denied with respect to the

Exchange Act Section 20(a) claims; and denied with respect to

the Exchange Act Section 20A claims as to defendants Puckett,

Listwin, Pace, and Kennedy.

SO ORDERED:

Dated:    New York, New York
          October 31, 2007

                                        DENISE COTE
                              United States District Judge

45